Agriculture proposed a modification to the forest plan development process. *See* National Forest System Land and Resource Management Planning, 67 Fed. Reg. 72770 (proposed Dec. 6, 2002) (to be codified at 36 C.F.R. pt. 219). The Forest Service observed that it has seldom been able to revise plans prior to the Forest Act's 15-year deadline. The primary reason for the delay is the excessive length of time needed to prepare a plan under the current rules. To speed the process, the Forest Service intends to recognize that plans themselves do not dictate site-specific actions; therefore, they are not actions that significantly affect the quality of the human environment. As such, forest plans would not be required to include Environmental Impact Statements prepared in accordance with the National Environmental Policy Act. The subsequent site-specific projects must be proposed and developed within the constraints of the Plan, and would be subject to the Policy Act and other applicable laws and regulations.

### III. Conclusion

For projects to be properly approved under the National Environmental Policy Act, they must be preceded by or accompanied by an Environmental Impact Statement that analyzes the impacts of the action on various resources within the forest. In this case, there was no scientific or other assessment under either the National Forest Management Act or the National Environmental Policy Act of permitting selection logging at the current levels, much less the additional acreage approved in the Rolling Thunder project. In the absence of the appropriate statutorily-mandated analysis, the approval of the Rolling Thunder project was arbitrary and capricious. The decision of the district court is REVERSED and the case is REMANDED with directions to enter summary judgment for the plaintiffs.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0084P (6th Cir.)
File Name: 03a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORTHWOODS WILDERNESS
RECOVERY, INC., DOUGLAS R.
CORNETT, and FRANK J.
VERITO,                                   No. 01-2508
        *Plaintiffs-Appellants,*

        *v.*

UNITED STATES FOREST
SERVICE, et al.,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 00-00015—David W. McKeague, District Judge.

Argued: December 12, 2002

Decided and Filed: March 21, 2003

Before: MERRITT and DAUGHTREY, Circuit Judges;
RUSSELL, District Judge.[*]

_____

[*]The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

————————————

**COUNSEL**

**ARGUED:**  Leigh Ann Haynie, Carencro, Louisiana, for Appellants.    Charles R. Gross, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellees.    **ON BRIEF:**  Leigh Ann Haynie, Carencro, Louisiana, for Appellants.  Glenda G. Gordon, ASSISTANT UNITED STATES ATTORNEY, Marquette, Michigan, for Appellees.

————————————

**OPINION**

————————————

MERRITT, Circuit Judge.  This case concerns a decision by the United States Forest Service to approve the Rolling Thunder timber project in the Ottawa National Forest on Michigan's Upper Peninsula.    Plaintiffs Northwoods Wilderness Recovery, Inc., Douglas R. Cornett, and Frank J. Verito argue that the approval of the timber project was in violation of the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act.  The basic question before us is whether the Forest Service acted arbitrarily when it approved selection cutting of hardwood timber acreage greatly exceeding the acreage projected in its Forest Plan and its Environmental Impact Statement.  On cross motions for summary judgment, the district court ruled in favor of the Forest Service on all counts.  Because we conclude that approval of the Rolling Thunder project without adherence to the statutorily-mandated environmental analysis was arbitrary and capricious, we REVERSE the judgment of the district court and REMAND with instructions to enter summary judgment for the plaintiffs.

The Forest Service counters that the Policy Act-based arguments fail because the sugar maple sentence was included in the Forest Plan, which was the product of the administrative process.  We agree that if this aspect of the Plan was properly adopted,[7] then the Forest Service may rely on the Plan to overcome any challenge based on the Forest Act.  However, the mere fact of the inclusion of the sugar maple provision does not shield the Forest Service from a challenge based upon the Policy Act.  The Forest Service never demonstrated, by citing to either the Plan or the Environmental Impact Statement, that the environmental impacts of the current level of selection logging ever was analyzed, much less unlimited selection cutting of sugar maples. No meaningful consideration was given to unlimited cutting of this species of hardwood, and it is unclear how, by whom, or for what reason the sentence was inserted.

Because the Policy Act promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action,  42 U.S.C. § 4321; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989), meaningful analysis and public comment were required prior to the approval of additional selection logging.  We conclude that approval of the Rolling Thunder project without adherence to the statutorily-mandated environmental analysis was arbitrary and capricious.

Having concluded that the excessive cutting of hardwood timber acreage violates the National Environmental Policy Act, we need not examine the consequences of the Forest Service's failure to revise the Forest Plan at issue within fifteen years as required by 16 U.S.C. § 1604(f).  We note, however, that on December 6, 2002, the Department of

————————————

[7]We need not reach the issue whether the Plan was properly adopted because we conclude that the inadequate environmental analysis under the National Environmental Policy Act dictates the outcome in this case.

timber sales must promote the desired future condition of the land and be consistent with the objectives of the management areas, the approval of the harvest of the additional acres included in the Rolling Thunder project is not consistent with the acreage projections in the Plan.

Having concluded that the approval of the Rolling Thunder project is inconsistent with the acreage estimates in the Plan, we turn now to the Forest Service's contention the sugar maple sentence exempts selection cutting of sugar maples from any such acreage limitation. The Forest Service argues that the sugar maple sentence trumps any limits placed on selection logging contained within the management area prescriptions. As noted earlier, in the general discussion of uneven-aged management of sugar maple stands, the Plan provides that "[f]or stands managed uneven-aged, there is no restriction on acreage of selection cuts within any one 10-year period."

The plaintiffs assert that the Forest Service has never conducted Policy Act analysis on the unlimited acreage of selection harvest of sugar maples. They contend that the Environmental Impact Statement only considered the environmental effects of each of the eight alternatives, none of which proposed unlimited sugar maple selection harvest. If the district court opinion is allowed to stand, the plaintiffs argue, then the Forest Service can permit every sugar maple to be cut, regardless of the management area, or the impact to wildlife, soils, vegetation, or water resources.[6]

---

reducing reliance on that method of harvest. The Service has therefore revised a key assumption underlying the Plan. The regulations suggest that the Service should, at a minimum, consider whether the Plan or its site-specific decisions need to be modified. *See id.*

[6] This overstates the situation because, as the Forest Service points out, the total timber harvest must remain within the ceiling of the Allowable Sale Quantity.

## I. Background

The National Forest Management Act of 1976 mandates that every national forest have a programmatic document called a forest plan to "guide all natural resource management activities," including use of the land for "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). The forest plan identifies the resource management practices, the projected levels of production of goods and services, and the location where various types of resource management may occur. Implementation of the forest plan is achieved through individual site-specific projects, and all projects must be consistent with the forest plan. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10. To ensure that forest plans remain in compliance with the Forest Act, the Forest Service must establish a monitoring strategy. *See* 36 C.F.R. § 219.11. Furthermore, the statute requires the Forest Service to "revise" the plan "when the Secretary finds conditions in a [Forest] have significantly changed." 16 U.S.C. § 1604(f). Forest plans, as well as site-specific proposals, must be prepared in compliance with National Environmental Policy Act, 42 U.S.C. § 4321, and the regulations contemplate the preparation of an appropriate Environmental Impact Statement as directed by the Policy Act as part of an integrated process. 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.6(b). Federal regulations permit an agency that is planning a major federal action to conduct a less exhaustive Environmental Assessment to determine whether the proposed action will "significantly affect" the environment and thus whether an Environmental Impact Statement is required. 40 C.F.R. §§ 1501.4(b), 1508.9 (2001). If the Environmental Assessment reveals that the proposed action will significantly affect the environment, the agency must prepare an Environmental Impact Statement. *See id.* Conversely, if the agency makes a Finding of No Significant Impact, 40 C.F.R. § 1501.4(e), then it is not required to prepare an Environmental Impact Statement.

The Ottawa National Forest is located on Michigan's Upper Peninsula. In 1986, the Forest Service issued its Forest Plan and accompanying Environmental Impact Statement for the Ottawa National Forest. The Plan divides the Forest into sixteen management areas. The Rolling Thunder project, the subject of this litigation, is located within Area 2.1. The Plan states that the desired future condition of the land in Area 2.1 is a continuous canopy of northern hardwoods with occasional permanent upland openings, and the Plan contemplates logging in Area 2.1 with an emphasis on "uneven-aged management."[1] The Plan envisions an average annual harvest within Area 2.1 of 1,440 acres by clear-cutting and 2,800 acres by selection cutting. Selection cutting involves removing individual trees in a scattered pattern from a large area, while maintaining the forest's canopy. Selection cutting fosters a forest of trees that differ markedly in age and/or size. By contrast, clear-cutting involves removing all commercial-sized trees from an area in one harvest.

On December 8, 1997, the Forest Service issued a Scoping Letter wherein it proposed the Rolling Thunder timber sale. The letter proposed additional clear-cutting on 176 acres of aspen stands and selection cutting on 1,391 acres of mixed northern hardwoods in Area 2.1.

The Forest Service then undertook an Environmental Assessment that evaluated the effects of the proposed alternatives on numerous resources. In May, 1998, the Forest Service issued the draft Environmental Assessment to the public for comment. Plaintiffs objected to the proposed project because the selection cutting within Area 2.1 already averaged more than 4,800 acres annually while the Plan

---

[1]Uneven-aged management encompasses both single tree selection and group selection and results in stands containing trees of different ages. Group selection involves cutting small patches of trees, while single tree selection involves selecting particular trees for cutting. *See Sierra Club v. Peterson*, 185 F.3d 349, 354 (5th Cir. 1999) (citing 36 C.F.R. § 219.3 (1999)).

me is that this plan does not have as its objective simply producing a number of board feet of wood for sawmills. It also has as its objective protecting the water quality, the soil quality, the vegetation, the birds, the fish, the deer, whatever else is in there, so to simply say we can go in and do whatever we want as long as we don't exceed a certain number of board feet would seem to me to make 90 percent of all of the analysis in the verbiage in the plan unnecessary surplusage.

In its Record of Decision, the Forest Service noted that "[t]he mix of uneven-aged and even-aged management in the Forest Plan will result in multiple use benefits including a variety of wildlife habitats and visual resources and will create a more diverse forest while providing for higher quantity and quality of hardwood timber in the future." Because the Plan and the Environmental Impact Statement considered not only the total amount of timber to be harvested, but the locations and methods of that harvest, changing the mix of harvest methods entails a deviation from the Plan.

Finally, the inclusion of the sugar maple sentence itself indicates that the acreage projections should be construed as limitations. If the acreage figure does not serve as a limitation, then there would be no need to include a statement that there is no restriction on acreage for selection cutting of sugar maples.

As evidenced by the monitoring and evaluation report, the number of acres harvested by selection cutting has greatly exceeded that amount envisioned in the Plan and its Environmental Impact Statement.[5] Because site-specific

---

[5]The regulations specify that monitoring information is to be used to determine, among other things, if key assumptions identified for monitoring in the Plan remain valid and the Plan or site-specific decisions need to be modified. *See* 36 C.F.R. § 219.11(d). By the Forest Service's admission, it has responded to public concern about clear-cutting by

production in the Forest, but incorrectly relies on the Allowable Sale Quantity as the only limit. Plaintiffs emphasize the distinction between timber production and the act of logging. Timber production is one of the multiple uses provided by a national forest, whereas logging is the method of achieving that use. While Allowable Sale Quantity is a limit on timber production, the acreage figures provide protection from logging activity for resources other than timber.

In our view, the Allowable Sale Quantity was not meant to be the only limitation on timber production in the Forest. Allowable Sale Quantity does not measure the impacts of logging on wildlife, vegetation, soils, and water quality, as required by the Forest Act. *See* 16 U.S.C. § 1604(e)(1). Before adopting the Plan, the Forest Service considered eight alternatives, along with the environmental impacts of each alternative. The alternatives ranged from lesser to greater quantities of timber production while utilizing different methods of logging. The Forest Service selected one alternative to implement because it concluded that the alternative provided the appropriate combination of improved wildlife habitat, vegetative conditions, and recreation opportunities, as well as the preferred mix of even- and uneven-aged logging.

The Forest Service's current position that the board-feet maximum is the only limitation on the timber harvest contradicts statements included in the Environmental Impact Statement. For example, the Forest Service noted that "[t]he mix of even-aged and uneven-aged management will also have an impact on other outputs and effects such as vegetative diversity, wildlife habitat, recreation opportunities, visual quality, viable populations of wildlife, hardwood sawtimber production ... and hardwood pulpwood production." As the district judge recognized at the hearing below,

The reason that [the Allowable Sale Quantity as the limit on logging] doesn't make very much intuitive sense to

envisioned only 2,800 acres. After considering and responding to the public comments, District Ranger Jeff Larsen issued a Decision Notice and a Finding of No Significant Impact. Among other things, the Decision Notice specifically authorized 1,055 acres of individual tree selection cutting of northern hardwood trees, as well as 95 acres of clear-cutting to regenerate soon-to-be-overmature aspen trees which were becoming susceptible to insects and disease.

Plaintiffs filed a timely administrative appeal of the Rolling Thunder decision pursuant to 36 C.F.R. § 215. On May 19, 1999, the Appeal Deciding Officer upheld Larsen's decision on Rolling Thunder.

On January 26, 2000, the plaintiffs filed a complaint in federal court challenging the Forest Service's decision to permit the Rolling Thunder project. Thereafter, the Forest Service withdrew two of the timber sales originally involved in the project.[2] On May 12, 2000, the plaintiffs filed an amended complaint challenging the remaining two timber sales. In the amended complaint, the plaintiffs alleged that the Rolling Thunder Decision Notice and the Finding of No Significant Impact are inconsistent with the Plan, and therefore in violation of the Forest Act and the Policy Act.

On cross-motions for summary judgment, the district court ruled in favor of the Forest Service on all counts. The district court gave a broad interpretation to language in the general section of the Plan on vegetation management. For sugar maples, the language provides that "[f]or stands managed uneven-aged, there is no restriction on acreage of selection cuts within any one 10-year period."[3] The district court interpreted this language as exempting selection cutting of

---

[2] According to the Forest Service, the project will involve only the clear-cutting of 95 acres and selection cutting of approximately 615 acres.

[3] The parties both refer to this sentence as the "sugar maple sentence."

sugar maples from any acreage limitation. Therefore, the court concluded that it need not decide whether the acreage projections in the Plan set limits on the annual harvesting by selection cutting. Relying on the maxim of interpretation that specific language within a document should control over general language, the court concluded that the acreage average for selection cutting in Area 2.1 was general language about the harvesting of all trees and the Plan's statement about uneven-aged management of sugar maples is specific language about a particular kind of tree. The district court concluded, "[i]f the 2800-acre average controlled, then it would make no sense to state that unlimited selection cutting of sugar maples could occur." To avoid such an inconsistency, the district court reasoned that the Plan's language about uneven-aged management of sugar maples was an exception to any acreage limitation in Area 2.1. Because the court found that the plaintiffs had not demonstrated that the additional selection cutting in Area 2.1 involved trees other than sugar maples, the court concluded that the plaintiffs had not shown that the selection cutting in the Forest violated the terms of the Forest Plan.

The plaintiffs then filed this timely appeal. On appeal, we may "set aside the agency determination only if it is arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law." *Sierra Club v. Slater*, 120 F.3d 623, 632 (6th Cir. 1997) (citing 5 U.S.C. § 706).

## II. Discussion

Plaintiffs' arguments can be summarized as follows: (1) the acreage projections contained in the Forest Plan should be construed as a limitation on logging in the Forest; and (2) the sentence in the Forest Plan which states that there is no limitation on the acres where sugar maples can be harvested, which was the basis of the district court's grant of summary judgment to the defendants, was improperly included in the Plan because it was never subjected to Policy Act analysis. We will address the plaintiffs' contentions in turn.

Plaintiffs assert that the approval of the Rolling Thunder project violates the Forest Act because the Forest Service is already permitting selection logging in Area 2.1 at a rate almost twice as great as, and inconsistent with, the rate projected in the Plan. Any additional harvest can serve only to exacerbate the excessive number of acres harvested by selection cutting.

The Forest Service counters that its approval of the Rolling Thunder project was proper and that timber harvesting within the Forest is not exceeding the amount foreseen in the Forest Plan. The Forest Plan set the Allowable Sale Quantity[4] for the Forest at 780 million board feet per ten-year period. The parties agree that the timber harvest within the Forest stayed well within the Allowable Sale Quantity, with an average annual harvest volume of 694 million board feet.

The Forest Service acknowledges that, since the adoption of the Plan in 1986, in response to public concern, it has reduced the number of acres harvested by even-aged methods (clear-cutting) in favor of expanded use of uneven-aged management, specifically selection cutting. The Forest Service argues that the corresponding increase in the number of harvested acres over the projections contained in Table 2.1b is irrelevant to the determination of whether the Rolling Thunder sale violates the Plan. Instead, "Table 2.1b is a 1986 projection of the number of acres likely to be touched by logging in order to generate the ASQ for the Forest; it is not a fixed limit on acreage, but rather a projection based upon 1986 methods." In 1986, the Forest Service asserts, the shift away from clear-cutting toward selection cutting was not anticipated.

Plaintiffs reply that the Forest Service correctly identifies the Allowable Sale Quantity as the ceiling for timber

---

[4] Allowable Sale Quantity is the "ceiling on the total amount of wood that can be cut." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998).