**File Name: 06a0526n.06**
**Filed: July 28, 2006**
**No. 05-1417**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **NORTHWOODS WILDERNESS RECOVERY,** | ) | **ON APPEAL FROM THE** |
| **INC. and HEARTWOOD,** | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE** |
| **Plaintiffs-Appellants,** | ) | **WESTERN DISTRICT OF** |
| **v.** | ) | **MICHIGAN** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **AGRICULTURE FOREST SERVICE** *et al.* | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |

BEFORE:      RYAN, COOK, Circuit Judges; and GWIN, District Judge.[*]

Gwin, District Judge:

Plaintiffs-Appellants Northwoods Wilderness Recovery, Inc. and Heartwood (collectively "Heartwood")[1] appeal from the district court's February 8, 2005 grant of summary judgment. The court's order denied the Plaintiffs' motion for summary judgment and awarded summary judgment to Defendants United States Department of Agriculture Forest Service *et al.* and Defendants-Intervenors Lake States Lumber Association and Lake States Resource Alliance (collectively "Forest Service"). Heartwood claims that the Forest Service failed to comply with

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

[1] The Plaintiffs are not-for-profit organizations focused on forest conservancy and preservation.

-1-

various federal environmental regulations before implementing a timber harvesting plan for the

Ottawa National Forest. For the reasons described below, we AFFIRM the judgement of the district

court.

## I. BACKGROUND

Before the district court, the Plaintiffs sought a declaratory judgment and equitable relief

related to the Ottawa National Forest, a wildlife region at the western end of Michigan's Upper

Peninsula. Specifically, the Plaintiffs sought an injunction stopping eighteen timber sales in a

division of the forest designated as Management Area 2.1.

*A. The 1986 Ottawa National Forest Final Environmental Impact Statement and the Land and Resource Management Plan*

The Ottawa National Forest, located in the western Upper Peninsula of Michigan, includes

approximately one million acres. In 1931, the government took ownership of the land and founded

the national forest. Because the area consisted largely of "heavily roaded and mostly cut-out and

burned-over land" (R. 45, J.A. 175), the Department of Agriculture undertook an aggressive

reforestation initiative in the years following the acquisition. That reforestation program focused

on mass tree planting. As a result, much of the current forestation is near uniform age: between

sixty and seventy years old.[2]

The National Forest Management Act of 1976 ("the Forest Act"), 16 U.S.C. § 1600 *et seq.*,

requires every national forest to develop a plan to regulate its natural resource management activities

including those affecting "outdoor recreation, range, timber, watershed, wildlife and fish, and

---

[2] This situation is not ideal, however, as forests are generally healthier when they comprise trees of diverse ages. (Final Impact Statement, R. 45, J.A. 224A).

wilderness." *Id.* § 1604(e)(1). Forest plans developed pursuant to the Forest Act, including the forest plan governing the Ottawa National Forest, must also conform to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* NEPA requires federal agencies to undertake a detailed analysis of the environmental impact of any proposed action if the action would significantly affect the quality of the human environment. *Id.* § 4332(2)(C)(i). If, at any period after this Environmental Impact Statement ("Impact Statement") has been completed, "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arises, the agency must prepare a supplement to the Impact Statement ("Supplemental Impact Statement"). 40 C.F.R. § 1502.9(c)(1)(ii).

Supplemental Information Reports are "formal instruments for documenting whether new information is sufficiently significant" to require a Supplemental Impact Statement. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000); Forest Service Handbook Directive 1909.15 § 18.1. A Supplemental Information Report is not as detailed or thorough as an Impact Statement and the agency need not subject it to public comment. *See Dombeck*, 222 F.3d at 560.

Currently, the Ottawa National Forest is managed under a forest plan called the Land and Resource Management Plan (the "Forest Plan"). The Forest Service developed the Forest Plan in 1986 pursuant to an Impact Statement, the *Final* Environmental Impact Statement (the "Final Impact Statement"). Repeating, the Ottawa National Forest operates under the 1986 Forest Plan that included an Environmental Impact Statement. After a proposal and public comment, the Forest Service issued a twenty-year plan for the area and divided the plan into two decades. The plan was adopted in October 1986 and the Forest Service began to implement it soon thereafter. The first

decade of the plan commenced in 1986 and ended in 1996. The second decade concludes in late 2006. (*See* R. 49, J.A. 235.)

To achieve its various objectives, the plan divided the forest into sixteen management areas. To help frame the objective for each management area, the Forest Service identified a "desired future condition" for each area, i.e., a long-term goal. (R. 46, Tab A D1-D5, J.A. 197-201.) The instant case involves Area 2.1, which covers approximately 359,700 acres.[3] Under the Forest Plan, the desired future condition for Management Area 2.1 is "a continuous canopy of northern hardwoods, interspersed with some aspen and softwoods." (R. 45, J.A. 206.)

To this end, the plan calls primarily for uneven-aged management of northern hardwoods, accomplished through "selection" harvesting. Selection harvesting involves cutting individual trees within a stand of even-aged trees. By thinning the forest canopy, this process encourages the growth of new trees and leaves the existing canopy intact. Another harvesting approach, called clear-cutting, removes all trees from a given area. Responding to public comment – including from Plaintiff Heartwood – the Forest Service's plan minimized clear-cut harvesting in favor of selection harvesting.

The adopted plan called for Management Area 2.1 to undergo 2800 acres of selection harvesting and 1440 acres of clear-cutting per year during the plan's first decade. During the second decade, the plan called for 4750 acres of selective harvesting and 1130 acres of clear-cutting per year. (R. 45, Table 2.1b, J.A. 208.)

---

[3] Management Area 2.1, like many other management areas, is not a continuous tract of land. Rather, it comprises several discontinuous tracts dispersed throughout the forest. (R. 41, J.A. 149.)

In implementing the plan during the first ten years, however, the Forest Service markedly deviated from the acreage projections. It substantially increased the selection harvesting and decreased the clear-cut harvesting. In the first decade, it conducted selection harvesting in excess of 4814 acres per year, over 2000 more acres per year than the Forest Service had projected would be harvested under the Plan. (R. 49, J.A. 227.) Because clear-cut harvesting fell short of the projection, the aggregate harvest during the first ten years of the Plan was about 1200 acres more than the Forest Plan projected for the first ten years. (*See id.*)

In 1997, as part of its second decade logging program, the Forest Service sought to initiate the "Rolling Thunder" timber sale. The sale called for an additional 1055 acres of selection harvest and 95 acres of clear-cut harvest for each year. Contending that the Rolling Thunder sale was inconsistent with the Forest Plan and thereby violated NEPA and the APA, the Plaintiffs filed suit in 2000.

### B. Northwoods Wilderness v. United States Forest Service

In *Northwoods Wilderness v. United States Forest Service*, 323 F.3d 405 (6th Cir. 2003), we reviewed the Forest Service's increase in selective harvesting during the first ten years of the Plan. We found that in the first decade, the Forest Service had substantially increased the harvest beyond what the Forest Plan had originally proposed. As a result, the Forest Service's approval of the Rolling Thunder sale was "arbitrary and capricious" because it did not conduct an assessment of the impact of the first decade's selection harvesting on various forest resources. *Id.* at 412.

After this decision, the Forest Service withdrew the Rolling Thunder timber sale, analyzed the effects of previous harvesting, and issued a Supplemental Information Report. The

Supplemental Information Report incorporated a study called the Ottawa National Forest FY 2002-03 Monitoring and Evaluation Report ("Monitoring and Evaluation Report")[4] and analyzed the impact of the increased selection harvesting during the first decade. The Supplemental Information Report determined that the increased harvesting had no effect on the environment beyond those discussed in the 1986 Forest Plan and Final Impact Statement. (R. 41, J.A. 83A.)

Despite finding no impact, the Forest Service began to drastically reduce harvesting in Area 2.1 during the second ten-year period of the Plan. As a result, the rate of selection harvest during the second decade fell well below the projections for the second ten-year period that the Forest Plan projected for that period. The new rate of selection harvest was 2577 acres per year, far fewer than the 4750 acres that the Forest Plan permitted for the second ten-year period. (R. 40, J.A. 82B.) In aggregate, the Forest Service now predicts that over the Forest Plan's twenty year period, fewer acres will be harvested from Area 2.1 than the Forest Plan predicted, despite the increased harvest during the first ten-year period that we found objectionable.

### C. The Present Lawsuit

Although it decreased its harvesting rate in the second decade, the Forest Service continued to pursue new timber harvest sales, and continues to do so to this day. Objecting to these sales, in 2003, Heartwood filed this law suit against the Forest Service. With this suit, Heartwood contends that the *Northwoods* decision and NEPA prohibit the Forest Service from conducting any further timber sales without "meaningful analysis and public comment." *See Northwoods*, 323 F.3d at 412.

---

[4] The Monitoring and Evaluation Report is a document prepared pursuant to the Forest Act. It is an annual study that reports on conditions in the Ottawa National Forest and monitors progress toward implementing the Forest Plan. (*See* R. 51, J.A. 228.)

Heartwood maintains that the analyses the Forest Service conducted, i.e., the Supplemental Information Report and Monitoring and Evaluation Report, are inadequate. Heartwood says the Forest Service must conduct a full Supplemental Impact Statement and allow for public scrutiny. Heartwood therefore seeks to enjoin all remaining timber sales in Area 2.1 until the Forest Service conducts such an analysis.

On cross-motions for summary judgment, the district court denied Heartwood's motion and granted summary judgment for the Forest Service. Heartwood timely appealed.

## II. STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment *de novo*. *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 462 (6th Cir. 1998). The Court therefore conducts the same analysis as the district court below. *Id.* That analysis is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. Under the APA, the Court's question on review is whether the challenged agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). The standard is narrow and highly deferential. The court presumes that the agency complied with the law; the court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-17 (1971).

While courts should presume that the agency has complied with the law, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.* at 415. Moreover, courts must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."

-7-

*Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992) (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983)). A decision is arbitrary and capricious[5] if the agency has: (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," *or* (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000).

### III.  ANALYSIS

The Appellants raise three issues[6] on appeal: (1) "[w]hether the effects of the excessive logging in the first decade of the Plan are known and have ever been subject to NEPA analysis," (2) "[w]hether the Supplementation Information Report, in the form of the 2002-2003 Monitoring and Evaluation Report, complies with NEPA or *Northwoods*," and (3) "[w]hether the Forest Service's refusal to allow public comment on the additional logging in the first decade violates *Northwoods*." (Br. of Appellants 2.)  The Court consolidates these as two related issues: (1) whether this Court's decision in *Northwoods* required the Forest Service to engage in "meaningful analysis and public comment" before carrying out any further timber sales when the further timber sales were within the acreage limits the Plan gave for the second ten-year period; and (2) whether, under NEPA, the Forest

---

[5] The courts differ on whether the standard is "arbitrary *and* capricious" or "arbitrary *or* capricious."  In effect, they seem to operate interchangeably. *See, e.g.*, *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000); *Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992).

[6] Before the district court, Heartwood challenged eighteen separate timber sales.  Finding that Heartwood had failed to exhaust its administrative remedies for all but six of them, the court held that it lacked jurisdiction over the remaining twelve.  Heartwood does not challenge this finding on appeal. (Op. at 7-9.)  Thus, the Court considers only the six proposed sales for which Heartwood exhausted its administrative remedies.

Service's Supplemental Information Report and Monitoring and Evaluation Report constitute adequate analysis of the excess harvesting's impact. We address them in turn.

### A. *The Northwoods Holding*

Heartwood first contends that our *Northwoods* holding requires the Forest Service to engage in "meaningful analysis and public comment" before implementing any further timber sales. In *Northwoods*, the Sixth Circuit held that "meaningful analysis and public comment were required prior to the approval of additional selection logging." *Northwoods*, 323 F.3d at 412. It concluded that "approval of the Rolling Thunder project without adherence to the statutorily-mandated environmental analysis was arbitrary and capricious." *Id.* Thus, a panel of this Court invalidated the Rolling Thunder timber sale because it exceeded the plan's first decade acreage limitations. It was, the Court held, "additional selection harvest," i.e., harvesting in excess of what the Forest Plan had contemplated. *Id.*

The parties dispute the proper interpretation of "additional selection harvest." The Plaintiffs make much of the phrase, arguing that the Court should interpret it to prohibit all post-*Northwoods* selection harvests until the Forest Service has completed a Supplemental Impact Statement and subjected it to public scrutiny. The Forest Service offers a far narrower interpretation of "additional selection harvest." It argues that the decision merely prohibits the Forest Service from conducting future selection harvesting that exceeds the acreage described in the Forest Plan.

When viewed in its proper context, our use of "additional selection harvest" in our earlier opinion clearly suggests the meaning for which the Forest Service argues. The phrase does not mean that the Forest Service must cease all selection logging until "meaningful analysis and public

comment" occur. *Northwoods* held:

> Because the [NEPA] promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing Government and public attention on the environmental effects of proposed agency action, meaningful analysis and public comment were required prior to the approval of additional selection logging. We conclude that approval of the Rolling Thunder project without adherence to the statutorily-mandated environmental analysis was arbitrary and capricious.

*Id.* at 412 (internal citations omitted).

By "additional selection logging," we were referring to logging that exceeds the projections in the Forest Plan, the effects of which the NEPA-required Final Impact Statement thoroughly considered. This Court earlier concluded that the Rolling Thunder project, one that exceeded the projected acreage figures even further, was therefore invalid. But nowhere did we suggest that all of the Forest Plan's future levels of harvesting were invalid. Accordingly, as the district court concluded, "selection harvest that is *below* the acreage projections is valid." (Op. at 12 (emphasis added)).

Also of consequence, the *Northwoods* Court declined to order a retrospective analysis of the effect of the past decade's excessive logging; its prohibition was exclusively prospective. When this Court concluded that without proper process, "approval of the Rolling Thunder project . . . was arbitrary and capricious," it conspicuously did not mention the need for such procedures before other future projects. Had we intended to address all sales going forward, we could have announced a broader rule that would have implicated the Rolling Thunder sale and other projects. Significantly, we declined to do so.

On this issue, then, the Court simply held that the acreage in the Forest Plan was not an

optional estimate, but a limitation. The Forest Service appears to have understood this. In reaction, it reduced its subsequent harvesting to bring the aggregate harvesting acreage for the twenty-year period below the levels in the Forest Plan.

As a result, the total number of acres harvested during the twenty-year period will remain under the total permitted by the Forest Plan. During the second decade, moreover, the annual rate of harvest will be far less than the Forest Plan permits. Having taken steps to achieve these results, the Forest Service did all that – and perhaps more than – *Northwoods* required.

### B. NEPA's Requirement

Apart from its argument that our decision in *Northwoods* forbade additional selective harvesting without a new Impact Statement even where the acreage was below the harvest already approved, Heartwood says that NEPA itself also directly proscribes the Forest Service's actions. Heartwood argues that NEPA demands additional impact analysis before the Forest Service carries out the proposed harvesting plan.

As discussed above, NEPA requires that any agency contemplating a "major Federal action[] significantly affecting the quality of the human environment" conduct a detailed analysis of the proposed action's environmental effects using an Impact Statement. 42 U.S.C. § 4332(2)(C). If, after the original Impact Statement has been completed, "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise, the agency must issue a Supplemental Impact Statement. 40 C.F.R. § 1502.9(c)(1)(ii). When new circumstances arise suggesting that a Supplemental Impact Statement might be necessary, the agency conducts a Supplemental Information Report. *See Friends of the Clearwater v. Dombeck*,

222 F.3d 552, 555 (9th Cir. 2000). To satisfy NEPA, this report must take a "hard look" at whether the new circumstances will significantly differ from those that the original Impact Statement discussed. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 374 (1989).

Heartwood contends that NEPA required the Forest Service to undertake an additional environmental impact study. Specifically, Heartwood argues that the Forest Service was obligated to prepare a Supplemental Impact Statement. Heartwood also says that the Forest Service must have submitted whatever action it took to public scrutiny. In essence, it says that the Supplemental Information Report wrongly concluded that the excess harvesting had no effect and that the Forest Service erred because it failed to take the necessary "hard look," *see Marsh*, 490 U.S. at 374, that NEPA requires. A bona fide "hard look," it argues, would have concluded that the excess harvesting *did* have an effect, thereby triggering a Supplemental Impact Statement.

We disagree. In conducting the Monitoring and Evaluation Report and issuing the Supplemental Information Report, the Forest Service satisfied its obligations under the APA and NEPA. Thus, its action was not arbitrary and capricious.

In its Supplemental Information Report, the Forest Service concluded that the first decade's excessive harvest "did not have unforeseen impacts to the environment" (R. 41, J.A. 83A) and therefore that a Supplemental Impact Statement was unnecessary. In so doing, the Supplemental Information Report incorporated the in-depth analysis contained in the Monitoring and Evaluation Report, a study that examined the effect of the first decade's harvesting on Ottawa National Forest natural resources such as wildlife, soil, and water.

Specifically, the Monitoring and Evaluation Report examined the excessive harvesting's

effect on various fauna such as threatened and endangered species and so-called "Management Indicator Species."[7] The Supplemental Information Report determined that "[t]he types and levels of harvest that have been emphasized, even though at an increased rate during the 1st decade of Plan implementation, will serve to improve habitats for many species on the forest." (R.41, J.A. 152.) For example, during the relevant period, the gray wolf population improved from an "endangered" to a "threatened" classification. (R. 41, J.A. 95.) Other species that the increased logging either did not affect or benefitted include the whitetail deer, northern goshawk, black bear, barred owl, American bittern, and ruffed grouse. (R. 41, J.A. 95-126.) In total, the eighty-seven page study examined how the harvesting had affected the forest's soil and water, at least nineteen key animal species, and several forms of rare plants, vegetation, trees, and other flora. Heartwood offers no evidence suggesting that the study was somehow biased, methodologically flawed, or otherwise deficient, and our review has found no such defect.[8]

As a result, the agency's decision that no Supplemental Impact Statement was required was not arbitrary and capricious. Heartwood cannot point to evidence showing that the Forest Service "relied on factors which Congress has not intended it to consider." *See Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000). Neither can it show that the Forest Service either

---

[7] Management Indicator Species are various plants and animals that the Forest Service monitors to gauge the effects of forest management on the forest's wildlife generally. (R. 41, J.A. 102.)

[8] While we find that this study was adequate, we must emphasize that the mere publication of a document, per se, is insufficient to satisfy NEPA. We find for the Forest Service because, after reviewing the relevant documents, we conclude that the documents reflect an analysis that is sufficiently thorough to constitute NEPA's requisite "hard look." If, hypothetically, a document purporting to make the requisite considerations in fact neglected to examine critical factors or was shoddily prepared, it could fail to meet NEPA's requirements.

"entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *See id.* Finally, the agency's conclusion is clearly not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See id.* Absent such evidence, the Court must presume that the agency's actions complied with the law. *Volpe*, 401 U.S. at 415-17.

Finally, the statutes do not require public comment on the Supplemental Information Report. *See Friends of the Clearwater v. Dombeck*, 222 F.3d at 559-60 ("Although NEPA requires agencies to allow the public to participate in the preparation of [a Supplemental Environmental Impact Statement], there is no such requirement for the decision *whether* to prepare [the Supplemental Environmental Impact Statement]."). The Forest Service met its obligations under the law by not acting arbitrarily and capriciously in preparing the Supplemental Information Report. It was not obligated to offer that report or any other document for public comment.

## IV. CONCLUSION

We conclude that the Forest Service's analysis of the first decade's increased harvesting was adequate under NEPA and the APA. As a result, the Forest Service did not behave arbitrarily and capriciously in proposing the six timber sales in question and the district court did not err in declaring them valid. For these reasons, the decision of the district court is **AFFIRMED**.