RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0374p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

HEARTWOOD, INC.; KENTUCKY HEARTWOOD, INC.,

*Plaintiffs-Appellants,*

*v.*

ELIZABETH L. AGPAOA, Regional Forester; UNITED STATES FOREST SERVICE, an Agency of the United States Department of Agriculture,

*Defendants-Appellees.*

No. 09-5761

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 07-00114—Karl S. Forester, District Judge.

Argued: October 21, 2010

Decided and Filed: December 13, 2010

Before: MARTIN, COLE, and CLAY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Joe F. Childers, GETTY & CHILDERS, PLLC, Lexington, Kentucky, for Appellants. Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Joe F. Childers, GETTY & CHILDERS, PLLC, Lexington, Kentucky, for Appellants. Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————————

## OPINION

———————————

COLE, Circuit Judge. Plaintiffs-Appellants Heartwood, Inc. and Kentucky Heartwood, Inc. (collectively "Heartwood") are non-profit corporations active in forest and species protection. Heartwood appeals the district court's judgment granting

1

Defendants-Appellees Elizabeth L. Agpaoa, the Regional Forester for the Daniel Boone National Forest ("Forest"), and the U.S. Forest Service (collectively "Forest Service") judgment on the administrative record. Heartwood claims that the Forest Service enacted the 2004 Forest Plan ("Plan") for the Forest in violation of the procedures mandated by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. Specifically, Heartwood alleges that, in promulgating the Plan, the Forest Service failed to consider a "no commercial logging" alternative and account for the environmental effects of herbicide use through an environmental impact statement ("EIS"). Heartwood also challenges the Forest Service's environmental assessment ("EA") for the 2003 Ice Storm Recovery Project ("Project") in the Forest, undertaken pursuant to the Plan; on this issue, Heartwood argues that the EA inadequately addressed the effects of herbicide application in the Project. Heartwood brings these claims against the Forest Service, a federal agency, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 550 et seq.

For the following reasons, we **REVERSE** the district court's judgment and **REMAND** this case to the district court with instructions to dismiss for want of jurisdiction.

## I.

### A. Statutory Background

Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment[, and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Under NEPA, "federal officials are required to assume the responsibility that the Congress recognized . . . as the obligation of all citizens: to incorporate the consideration of environmental factors into the [federal] decision-making process." *Envtl. Def. Fund v. Tenn. Valley Auth.*, 468 F.2d 1164, 1174 (6th Cir. 1972). Officials comply with NEPA "primarily by [conducting] an [EIS] for any 'major Federal action significantly affecting the quality of the human

environment.'"  *Burkholder v. Peters*, 58 F. App'x 94, 96 (6th Cir. 2003) (quoting 42 U.S.C. § 4332(2)(C)).  An EIS is a "detailed statement" that describes:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).  If an agency does not believe that the federal action will have a "significant impact" on the environment, then NEPA's regulations permit the agency to conduct a less exhaustive EA.  40 C.F.R. §§ 1501.4(b), 1508.9.  If the EA reveals a significant impact, then the agency must prepare an EIS; if it does not, then the agency may simply issue a finding of no significant impact.  40 C.F.R. § 1501.4.

Meanwhile, NFMA governs the National Forest Service and Regional Foresters' management of the national forest system; under that act, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).  A forest must be revised at least every fifteen years, or sooner if conditions in the forest "have significantly changed."  *Id.* § 1604(f)(5).  "Implementation of the forest plan is achieved through individual site-specific projects, and all projects must be consistent with the forest plan." *Northwoods Wilderness Recovery v. U.S. Forest Serv.*, 323 F.3d 405, 407 (6th Cir. 2003) (citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10). The NFMA forest plans and site-specific projects must also comport with NEPA's requirements, including preparation of an appropriate EIS or EA.

**B. Factual Background**

Heartwood, Inc. and Kentucky Heartwood, Inc. are not-for-profit corporations involved in the protection of the forests and species of the eastern United States and Kentucky, respectively. Both organizations are interested in protection of the Forest in Kentucky.

1. *The Plan*

Until the consideration and passage of the current Plan, the Forest Service managed the Forest under a Forest Plan approved on September 27, 1985. Because of its duty to revise a Forest Plan at least every fifteen years, the Forest Service published notice that it intended to prepare an EIS to revise its Forest Plan on June 21, 1996. After a period of identifying the issues to be addressed, 40 C.F.R. §§ 1502.4, 1508.25, the Forest Service received numerous comments from the public, including Heartwood. These comments called for, among other things, the Forest Service's consideration of a "no commercial logging" alternative and no herbicide application.

After this process, the Forest Service completed its draft EIS on April 1, 2003. The draft EIS proposed eight alternative plans for management of the Forest, six of which the Forest Service considered in detail and two of which it did not. Of note, the Forest Service considered Alternative B-1, a minimal-management option, in detail, and considered Alternative B, a no-management option, not in detail. The Forest Service, meanwhile, recommended adoption of Alternative C-1, which emphasized maintenance and restoration of ecological processes while facilitating public enjoyment and recreation. During the next period of public comment, 40 C.F.R. § 1506.10(b)(1), Heartwood and others made numerous comments on the draft EIS. A number of these comments, echoing those sent earlier, protested the Forest Service's failure to consider a reasonable "no commercial logging" alternative representative of public opinion, or to discuss the effects of and limits on herbicide use. These comments further proposed several additional alternatives.

On April 16, 2004, the Forest Service issued its final EIS and the Regional Forester adopted the current Plan, implementing Alternative C-1. Heartwood appealed the final EIS and Plan, but the Forest Service affirmed its prior decision.

2. *The Project*

On February 15, 2003, a significant ice storm destroyed trees on over 25,000 acres of the Forest. As a result, the Forest Service determined that restoration efforts in the Forest would require, among other things, commercial logging of 4,845 acres of damaged and downed trees, and control of non-native invasive plants through removal on 1,000 acres, in part by careful application of herbicides on approximately 700 acres. Although the Forest Service decided ultimately to adopt this course, it considered—and rejected—an alternative involving no commercial logging or herbicide application. The Forest Service undertook numerous studies on herbicide use in the Project before reaching its decision.

On November 11, 2004, the Forest Service chose the aforementioned alternative including commercial logging and herbicide application, and published an EA stating that the Project merited a finding of no significant impact. During the period of public comment, 36 C.F.R. § 215.6(a)(1)(i), Heartwood and others sent comments protesting commercial logging, herbicide application, and the Forest Service's decision not to prepare an EIS. However, several subsequently published reports by other agencies agreed with the Forest Service's conclusions on the Project.

Heartwood appealed the EA, but the Forest Service affirmed its prior decision. As of November 18, 2008 (the most recent update on the Project's status in the record), the Project was underway, and the Forest Service had yet to complete 3,754 acres of projected commercial logging and 600 acres of herbicide application. At oral argument, the Forest Service indicated that the Project is ongoing.

3. *The Current Litigation*

Heartwood filed its complaint in the United States District Court for the Eastern District of Kentucky appealing the Forest Service's decisions on both the Plan and the Project. Heartwood moved for judgment on the administrative record, seeking declaratory and injunctive relief for numerous violations of NEPA, NFMA, the Endangered Species Act ("ESA"), 16 U.S.C. § 1533 et seq., and for other unrelated errors. On April 27, 2009, the district court denied Heartwood's motion and instead entered judgment in full for the Forest Service. This appeal followed.

Here, Heartwood advances three main claims: (1) the Plan is invalid under NEPA and NFMA because the Forest Service failed to consider the reasonable alternative of "no commercial logging"; (2) the Plan is invalid under NEPA because the Forest Service failed to consider the effects of herbicides generally; and (3) the Project's EA is invalid under NEPA because the Forest Service failed to consider and to discuss adequately the effects of herbicide use.

**II.**

Our first question is whether Heartwood has standing to challenge the Project and Plan. Federal courts have limited jurisdiction, and we can only exercise the powers vested in us by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). We therefore have "an independent obligation to investigate and police the boundaries of [our] own jurisdiction." *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 607 (6th Cir. 1998), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 (2006). This duty allows and indeed requires us to raise jurisdictional issues of our own accord when we see them. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).

To establish standing under Article III, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). A plaintiff that sues a federal agency must also demonstrate that: (1) its complaint "relate[s] to 'agency action,' which is defined to include 'failure to act'"; and (2) it "suffered either 'legal wrong' or an injury falling within the 'zone of interests' sought to be protected by the statute on which [its] complaint is based." *Ctr. For Biological Diversity v. Lueckel*, 417 F.3d 532, 536 (6th Cir. 2005) (citations omitted). Moreover, associations like Heartwood have yet another set of required showings: "(1) the organization's members would otherwise have standing in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the law suit." *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 966 (6th Cir. 2009). This mishmash of interrelated but slightly separate requirements—for associations suing because of federal agency action, eight in total—no doubt creates a web of confusion difficult to untangle. Unfortunately, Heartwood seems to have lost sight of the forest of constitutional standing for the trees of associational and agency standing, and it fails to allege with adequate specificity the central element of injury in fact.

In support of its motion for a preliminary injunction before the district court, Heartwood submitted two of its members' declarations to show it had standing to maintain this suit. (Exhibit E - Standing Declaration of Chris Schimmoeller, Dist. Ct. Docket No. 30-6; Exhibit F - Standing Declaration of Steve Chaplin, Dist. Ct. Docket No. 30-7.) The district court never explicitly addressed this issue, presumably concluding that these affidavits sufficed to establish Heartwood's standing.

We have explained that injury to aesthetic, recreational, or scientific interests may constitute "concrete injury," but we have stressed that "plaintiffs can only suffer a concrete injury if the Forest Service . . . [is] undertaking or threatening to undertake activities that cause or threaten harm to the plaintiffs' protected interests." *Lueckel*, 417 F.3d at 537. Both Mr. Chaplin and Ms. Schimmoeller's affidavits indicate that the

Forest provides them with aesthetic, recreational, and scientific pleasure. For example, Mr. Chaplin attests:

> As a citizen who respects, appreciates and acknowledges the important role a biodiverse and healthy ecosystem plays for past, current and future human generations, as well as other living creatures, it pains me to stand witness to policies affecting the public lands of the [Forest] that could be deemed to have detrimental affects [sic] on endangered and threatened species, clean soil, water and air, and on numerous other species which may be on the brink of becoming threatened or endangered.

(Exhibit F - Standing Declaration of Steve Chaplin, Dist. Ct. Docket No. 30-7 ¶ 5.) Mr. Chaplin further explains that he visits the Forest regularly (*id.* ¶ 6), has seen the detrimental effects of "illegal all-terrain vehicle use, inappropriate recreational use, unnecessary commercial logging, excessive burning and road building, well-drilling and coal-mining and other inappropriate activities within the [Forest]" (*id.* ¶ 4), and believes that "[p]rojects like the Morehead Ice Storm and land use plans like the one currently in place . . . do not represent the planning, vision and commitment necessary" for the Forest's management (*id.* ¶ 7).

Ms. Schimmoeller too indicates that she enjoys the Forest: "Personally, I use and value the forest for a variety of reasons. Ecologically, aesthetically, spiritually, recreationally, and educationally, the [Forest] enhances my life and understanding of the natural world." (Exhibit E - Standing Declaration of Chris Schimmoeller, Dist. Ct. Docket No. 30-6 ¶ 4.) She continues: "I have visited countless areas that have been or will be affected by the Storm salvage sale and the Forest Plan. . . . In place after place, I have seen how logging destroys intact forests and the species they host." (*Id.* ¶¶ 5-6.) Ms. Schimmoeller then concludes:

> 8) Continued implementation of the current Forest Plan, including the Storm Recovery Project, impairs me and future generations of my family from experiencing the beauty and understanding the complexity of functioning forest ecosystems with their full host of species.
>
> 9) I intend to continue using the [Forest] throughout my lifetime and I look forward to exploring the Forest and Storm salvage project area with my children.

(*Id.* ¶¶ 8-9.)

Ms. Schimmoeller's references to the "Storm salvage project area" are the most specific discussion in either affidavit of how either individual will suffer *concrete and particularized* harm from the Forest Service's implementation of the Project under the Plan. Heartwood's problem is therefore one of specificity, since the Project affected over 25,000 acres; even focusing on only the land to be logged commercially, we note that such an area encompasses nearly 5,000 acres.

Is this narrowing adequate to support standing? The Supreme Court answered this question nearly twenty years ago: The specificity requirement of standing "is assuredly not satisfied by averments which state that . . . [an individual] uses unspecified portions of an immense tract of territory." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Heartwood might, rightfully, respond that Ms. Schimmoeller *has* specified the portions of the Forest at issue: those affected by the Project. However, such a suggestion, like a Russian matryoshka doll, merely reveals a second-level inquiry: Does, then, the Project's 25,000 acres, or even the 5,000 acres of commercial logging, constitute an "immense" area of land, the "unspecified portions" of which Ms. Schimmoeller actually uses?

Yes, it does, and Heartwood was on notice of this fact. In a relatively recent opinion, we explained the difference between sufficiently detailed standing affidavits and insufficiently detailed standing affidavits. *See Lueckel*, 417 F.3d at 537-38. In *Lueckel*, we first noted that plaintiffs "must show that actual, site-specific activities are diminishing or threaten[ing] to diminish their members' enjoyment of the designated river segments [in the forest]." *Id.* at 537. We then separated the chaff:

> Most of the affidavits submitted by the plaintiffs . . . refer generally to logging and road-building within wild and scenic river corridors without demonstrating that the affiants' enjoyment of any particular river segment has been diminished by specific instances of logging or road-building. In our view, these affidavits fail to set forth "specific facts" that can satisfy the plaintiffs' burden under Rule 56 [regarding standing].

*Id.*[1] Next, we pointed out what *sufficient* affidavits contain:

> The affidavits of [two plaintiffs], on the other hand, identify *specific activities and events* that have diminished or will diminish the affiants' enjoyment of *particular river corridors*. These are: logging along the East Branch of the Ontonagon River, logging in the Ontonagon River corridor, logging in the Sturgeon River corridor, flooding and de-watering of the Middle Branch of the Ontonagon River, logging along the Cisco Branch of the Ontonagon River, and logging along the East Branch of the Presque Isle River. . . . It seems to us that the plaintiffs have "set forth specific facts" showing that they are being injured by activities affecting some of the river segments at issue.

*Id.* at 538.

Our discussion in *Lueckel* thus clarified that environmental plaintiffs seeking to establish standing must identify particular segments of a river, sections and sub-sections of a forest, or passes in a mountain range that they use and will continue to use, and that agency action will detrimentally affect. *Id.* And Heartwood cannot complain that the Forest Service did not adequately specify which areas would be affected by the Project. The Forest Service provided Heartwood with a series of maps differentiating areas of, for example, commercial logging and non-commercial logging. (*See* EA Maps, Admin. R. Index B: Doc. Nos. 45b-45q, Dist. Ct. Docket No. 19.) Were the Project less specific, we could not require Heartwood to detail what it did not know, but that is not this case. Heartwood's standing affidavits are too general in their identification of "site-specific activities [that] diminish[] or threaten to diminish their members' enjoyment of the designated" forest sub-sections, so Heartwood does not have standing to maintain this action. *See Lueckel*, 417 F.3d at 537.

---

[1]Although both *Lujan* and *Lueckel* speak in terms of summary judgment and Rule 56 of the Federal Rules of Civil Procedure, the issue here is not one of inadequate evidence, but inadequate specificity within the evidence; the context thus does not change the inquiry and applicability of those cases to Heartwood.

**III.**

For the reasons explained above, we **REVERSE** the district court's judgment and **REMAND** this case to the district court with instructions to dismiss for want of jurisdiction.