BOGGS, J., delivered the opinion of the court, in which STAFFORD, D. J., joined. CLAY, J. (pp. 934-51), delivered a separate dissenting opinion.
OPINION
BOGGS, Circuit Judge.
This case arises out of a long-standing federal environmental compliance action against the Detroit Water and Sewerage Department (“DWSD”), which for over 30 years has been unable to achieve sustained compliance with the Clean Water Act and state environmental laws. In the most recent round of violations and court orders, a federal district judge in the Eastern District of Michigan attempted to begin a final resolution of the chronic problems in the DWSD. On September 9, 2011, the judge gave a committee of local officials 60 days to come up with a final plan — or else face a more intrusive court-ordered remedy. On November 4, 2011, he adopted most of the committee’s recommendations but took the additional step of directly abrogating some provisions in *927 the collective bargaining agreements (CBAs) of approximately twenty different bargaining units. None of the DWSD unions were parties in the case. Within two weeks, the Michigan American Federation of State, County, and Municipal Employees (AFSCME) Council 25 filed a motion to intervene to challenge the order, which the district court denied as untimely. Subsequent motions by four more unions were also denied.
Although the Unions were aware of the potential significance of the proceedings and failed to intervene before the court-approved committee returned its recommendations, total denial of intervention was an abuse of discretion. The Unions have substantial interests at stake that “may as a practical matter” be impaired absent intervention. Fed.R.Civ.P. 24(a)(2). While concerns of delay and re-litigation are serious, they can be alleviated by limiting the scope of intervention instead of outright denial. Therefore, we reverse the decision of the district court, with orders to limit the scope of intervention on remand.
I
In 1977, the Environmental Protection Agency initiated this federal action against the State of Michigan, City of Detroit (the “City”), and the DWSD for exceeding effluent limitations and failing to satisfy monitoring requirements, in violation of the Clean Water Act, 33 U.S.C. § 1251 et seq. The DWSD is a City agency responsible for wastewater collection, treatment, and disposal services and water service to millions of residents in both Detroit and in various suburban communities. Employees of the DWSD currently number nearly two thousand, and are represented by twenty different City-wide bargaining units, most of which include many non-DWSD employees.
Later in 1977, District Judge Feikens entered an initial Consent Judgment, which instituted a plan to deal with various staffing, equipment, and procurement issues. Over the course of the next thirty years, the DWSD fell in and out of compliance with the Clean Water Act and its state permits, requiring multiple amended consent judgments, the commissioning of numerous investigative reports, and appointment of Special Administrators with broad powers to bypass constraints on the City government — including the ability to override the City Council and to “revisit existing union contracts and civil service rules.” The consent judgments and reports were consistent in identifying a host of problems that plagued the DWSD to the core, including technical, managerial, institutional, and organizational issues. From the start, human resources issues were prominent among the identified problems. In 1978, court-appointed monitor Dr. Jonathan Bulkley found “chronic and severe understaffing” of qualified skilled personnel at the DWSD: less than half of skilled positions were filled, but staff in entry-level positions had bloated to quadruple the budgeted amount. Even after the plant was brought into compliance by the actions of the first Special Administrator, the problems remained: a 1994 DWSD report identified several festering staffing problems, including inflexible City-wide policies, outdated job descriptions, and “no method to evaluate employees for performance or advancement potential.” After a relapse in 1997, a committee tasked by Judge Feikens issued a report in 2000, finding similar problems to those identified before, including, again, chronic under-staffing, inadequate training, outdated job descriptions, and promotion policies that made competitive hiring “difficult, if not impossible.” Although the technical causes of noncompliance were subsequently re *928 solved in large part, a consultant hired by the City warned in 2007 that “issues that are more people and organizationally related [ ] could possibly jeopardize sustained compliance.” As anticipated, the DWSD again fell out of compliance in 2009, and the court called upon Dr. Bulkley for a second investigative report. Sounding a more urgent note, his report noted “striking similarity” to earlier problems and recommended that “[i]t may be appropriate to consider more fundamental corrective measures to address the institutional problems.”
Judge Cox was reassigned the case in late 2010 upon the retirement of Judge Feikens. On February 11, 2011, Judge Cox entered a stipulated order reorganizing the Board of Water Commissioners to ensure greater expertise and autonomy. In the order, Judge Cox invited any of the parties to file a motion to dismiss within 6 months if “substantial compliance” with state permits and prior consent judgments could be shown. In the meantime, the DWSD had been dealing with state regulators concerning its 2009 and 2010 permit violations. On August 31, 2010, the DWSD had developed a “Corrective Action Plan” at the request of state regulators. In general and aspirational terms, the DWSD set goals of re-engineering and reducing delay in the staffing process, revising and realigning its organizational structure and role definitions, and ensuring adequate skilled staff — including, “[i]n collaboration with its union constituents,” identifying tasks to be performed by subcontractors. Unable to meet the goals of the Corrective Action Plan, the DWSD entered into an Administrative Consent Order with state regulators effective July 21, 2011.
Armed with the Administrative Consent Order, the DWSD filed a motion to dismiss the federal action, arguing that the Second Amended Consent Judgment was outdated and that state supervision and the new Administrative Consent Order would be sufficient and more appropriate to bring the DWSD into compliance. Two suburban counties — Oakland and Ma-comb — objected, both calling for further empowerment of the Board of Water Commissioners, as the “Executive Branch of the City has failed to do what it takes” despite being “given multiple opportunities and extraordinary powers.” In the statements of facts in their responses to the City’s motion to dismiss, the counties elaborated on the long-standing human resources problems facing the DWSD, noting the problem with City-wide “bumping rights,” compensation restricted by CBA and City policy, delays in hiring, and lack of effective upper-level management. Both counties called for injunctive and other relief specifically targeting union practices.
Judge Cox rejected the DWSD’s arguments in a September 9, 2011, order (“September 9 Order”), finding the DWSD unable to achieve even short-term compliance with the consent order. He again emphasized the root causes “consistently” found by the numerous reports issued over the years, including lack of qualified personnel, hiring delays, insufficient training, obsolete job descriptions, required use of the City HR department, and restrictive City personnel, civil service, and union rules. Judge Cox emphasized that “human resources issues have been a chronic problem for the DWSD for the past 34 years.”
With respect to diagnosing the problem, Judge Cox’s order did not break any new ground. However, in addressing remedies, he heeded the call of the 2010 Bulkley Report and the suburban counties, concluding that “in order to achieve long-term compliance with the Clean Water Act, other less intrusive measures, over many *929 years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required.” Giving local officials one last chance, Judge Cox tasked a committee of City and DWSD leadership (“Root Cause Committee”) to propose a plan for long-term compliance within 60 days. In formulating its recommendations, the Committee was to be unconstrained by “any local Charter or ordinance provisions or by the provisions of any existing contracts.” Judge Cox noted that any effective remedy to achieve sustained compliance would require the court to order “structural changes ... that will likely override the City of Detroit’s Charter, its local ordinances, and/or some existing contracts.” (emphasis added). If the Committee failed, Judge Cox indicated he would take matters into his own hands by means of an unspecified “more intrusive remedy.”
News media were quick to understand and report the implications of Judge Cox’s decision. Articles appeared on the front pages of the Detroit Free Press and the Detroit News, explaining that Judge Cox had “ordered city officials Friday to disregard union contracts, local ordinances and even the city charter.” The Unions likewise expressed their disapproval, with Local 207 president John Riehl quoted on the day of the order accusing Judge Cox of “suggesting that some type of dictatorship can solve this” and a few days later vowing to “file for intervenor status in federal court.” (App’x to Br. of Appellee Macomb County Exs. 14,16.)
During the 60-day period, the Root Cause Committee reviewed all of the historical reports concerning the DWSD and consulted a broad range of stakeholders, including union representatives, DWSD management, industry professionals, and DWSD vendors.[1] The Committee acted within the 60-day period and returned its findings on November 2, 2011, calling for changes in procurement, management, organization, and, most relevant to this appeal, a range of human resources policies governed by CBAs. The Committee, however, was unable to come to an agreement as to how issues with union work-rules should be addressed. Two days later, Judge Cox adopted most of the recommendations of the Committee and issued the most aggressive remedial order to date. He affirmed the Committee’s recommendation that the DWSD establish an administrative structure autonomous from the city and disregard the requirements of the City’s procurement policy. Further, he ordered striking any offending provisions of the CBAs, including City-wide bargaining, bumping, seniority, limits on subcontracting or outsourcing, job descriptions, non-merit-based promotion, and overtime. Judge Cox even enjoined “the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes arising from the changes ordered by this Court” and also enjoined the Unions — not before the court — from “filing any grievances, unfair labor practices, or arbitration demands.” While the order was admittedly more intrusive than any issued before in the case, Judge Cox declined to employ some of the more extreme measures suggested by the Root Cause Committee, including suspension of the City’s duty to bargain, reestablishing the DWSD as an independent regional authority, or termination of the entire workforce.
Within ten days, the Michigan AFSCME Council 25 moved to intervene as of right, *930 arguing that the court order violated the Contract, Takings, and Due Process Clauses of the U.S. Constitution, and alleging that the order “does absolutely nothing to stop pollution or enforce the Clean Water Act.” (italics in original). Due to the health risks of the ongoing violations and fact that he had already issued an injunction to remedy the same, Judge Cox gave expedited consideration to the motion, denying it as untimely four days later. Two weeks later, AFSCME Local 207 and the Senior Accountants, Analysts and Appraisers Association also moved to intervene, arguing that the court exceeded its powers and improperly failed to join the Unions or provide a hearing before issuing its November 4 injunction. Applying the exact same reasoning as before, Judge Cox denied the motion as untimely.
In the orders denying intervention, Judge Cox relied on Michigan Ass’n for Retarded Citizens v. Smith, 657 F.2d 102 (6th Cir.1981), and Stotts v. Memphis Fire Dep’t, 679 F.2d 579 (6th Cir.1982), both of which denied intervention to unions that sought to challenge consent decrees after they were entered by the district courts. Applying five timeliness factors from those cases, Judge Cox found that the unions long should have known of their interest at stake, did not have a proper purpose to seek intervention at such a late stage in the litigation, and that further delay would prejudice the health and safety of the population of southeastern Michigan.
The Unions now appeal from the denials of intervention.[2]
II
Rule 24(a) provides for intervention as of right[3] “[o]n timely motion” to anyone with an unconditional statutory right or who
claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant’s ability to protect its interest, unless existing parties adequately represent that interest.
Fed.R.Civ.P. 24(a). If the motion is untimely, the court must deny intervention. Mich. Ass’n for Retarded Citizens, 657 F.2d at 105. As timeliness is a matter within the sound discretion of the court, the ruling will be reviewed under an abuse of discretion standard. Ibid. We will find abuse of discretion only if we are “left with the definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where the trial court improperly applies the law or uses an erroneous legal standard.” Coal, to Defend Affirmative Action v. Granholm, 501 F.3d 775, 779 (6th Cir.2007). Timeliness is to be determined from all the circumstances, including:
(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his or her interest in the case; (4) the prejudice to the original parties due to the proposed intervenor’s failure, after he or she knew *931 or reasonably should have known of his or her interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.
Grubbs v. Norris, 870 F.2d 343, 345-46 (6th Cir.1989).
The district court provided substantial grounds for denying intervention. As to the first factor, the district court reasoned that the long history of remedial attempts, court orders, and expert reports makes clear the “extensive progress in this case.” Dist. Ct. Op. at 18. More narrowly, the Unions waited to intervene until after the completion of the Root Cause Committee report; such delay weighs strongly against re-running that process. As to the second factor, the Unions made no attempt to limit the scope of interventions, evidencing a willingness to challenge core premises of the litigation. See AFSCME Motion to Intervene at 4 (“The Court’s Order restricts the rights of City employees and City unions, it does absolutely nothing to stop pollution or enforce the Clean Water Act.”) (italics in original); Br. supporting Local 207 Motion to Intervene at 2 (“[T]he Court’s November 4 Order in fact will do nothing to advance the cause of clean water in southeastern Michigan—a fact Local 207 and the SAAA could have made plain____”); Br. of Local 207 at 17 (“The Clean Water Act has never been interpreted as a vehicle for the federal courts to implement their view of proper labor relations.... ”). The Unions’ positions were further weakened by technical deficiencies in their motions, whose failure to conform to Rule 24(c) obscured what relief the Unions were actually seeking. The third factor was particularly important: the Unions were actually and reasonably aware of their threatened interests by the time of the September 9 Order, but opted to “wait and see” what the results of the Root Cause Committee report would be. Stotts v. Memphis Fire Dep’t, 679 F.2d 579, 584 n. 3 (6th Cir.1982). Finally, the district court was concerned with prejudice to the parties and the general public, as the delay caused by intervention would “present a serious health, safety and environmental risk to the people of Southeastern Michigan.” Dist. Ct. Op. at 17.
The facts in this case are not one-sided, however. The mere passage of time—even 30 years—is not particularly important to the progress-in-suit factor. See Stupak-Thrall v. Glickman, 226 F.3d 467, 475 (6th Cir.2000). Instead, the proper focus is on the stage of the proceedings and the nature of the case: this suit has essentially been in a remedial, non-adversary posture from the start, and despite significant progress, cannot be expected to end any time soon. On the second factor, when the deficiencies of the Unions’ motions are cleared away, the core of their purpose for intervention is substantial: their collective bargaining rights have been impaired, not just practically, but directly, by the decision of the district court. Where future progress remains and the intervenor’s interests are relevant, intervention may be the most effective way to achieve a full and fair resolution of the case.
The close balance of fact-specific considerations, as well as the complexity of the underlying case, would ordinarily counsel deferring to the district court’s discretion to deny intervention. See, e.g., Stotts, 679 F.2d 579; Michigan Ass’n for Retarded Citizens, 657 F.2d 102. But courts are not faced with an all-or-nothing choice between grant or denial: Rule 24 also provides for limited-in-scope intervention. See Fed.R.Civ.P. 24, advisory committee’s note, 1966 amendments (“Intervention of right ... may be subject to appropriate conditions or restrictions responsive *932 among other things to the requirements of efficient conduct of the proceedings.”). Recognizing this, courts often permit intervention even after final judgment, for the limited purpose of appeal, United Airlines, Inc. v. McDonald, 432 U.S. 385, 394, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), or to participate in future remedial proceedings, Hodgson v. United Mine Workers of Am., 473 F.2d 118, 129 (D.C.Cir.1972). Intervention may also be limited to “claims raised by the original parties,” subject to a bar to raising “collateral issues.” Fund For Animals, Inc. v. Norton, 322 F.3d 728, 737-38 & n. 11 (D'.C.Cir.2003) (reversing denial of intervention and remanding to district court with the “option” to limit scope); see also Trbovich v. United Mine Workers of Am., 404 U.S. 528, 537, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (permitting intervention limited “to the claims of illegality presented by the Secretary’s complaint,” but not permitting consideration of two additional grounds for setting aside union election). See generally David Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv. L.Rev. 721, 727 (1968) (“It is both feasible and desirable to break down the concept of intervention into a number of litigation rights and to conclude that a given person has one or some of these rights but not all.”).
Limited intervention is particularly appropriate in fact-specific situations such as this one, where the case is complicated, non-adversarial, and implicates the public interest; getting all interested parties to the table promotes an effective and fair solution, but preventing an expansion of the scope is necessary to keep control of the case. In probably the most analogous case to this one, Stotts, Judge Martin made a similar suggestion in dissent: “Had intervention been granted in this case, limited to a hearing describing and defending alternative promotional plans, the District Court could have resolved the merits of the proposals in short order, with little or no delay.” Stotts v. Memphis Fire Dept., 679 F.2d 579, 596 (6th Cir.1982) (Martin, J., dissenting). Indeed, this very case has seen various forms of limited intervention; both in 1980 when Judge Feikens issued an order to show cause to the Unions why he should not override a decision of a labor arbitrator, and in 2000 when the Army Corps of Engineers was ordered to show cause why it should not accept DWSD sludge. See United States v. City of Detroit, 329 F.3d 515 (6th Cir.2003) (en banc).
On the facts of this case, the district court’s legitimate concerns with finality, prejudice, and efficiency could just as well — or better — have been addressed by limiting the scope of intervention. Therefore, the district court abused its discretion in denying intervention outright. The first major concern with intervention in this case is that it could disturb the settled progress in this case. Interested parties should not be able to join at a late stage and re-litigate issues that they watched from the sidelines. But the district court can ensure this without denying intervention: the scope of intervention can be limited on a prospective basis, allowing appeal of recently issued orders and participation in new matters. Such limited intervention would not interfere with the orderly processes of the court, as the Unions sought to intervene before the time for appealing the November 4 Order expired. See United Airlines, Inc., 432 U.S. at 392, 97 S.Ct. 2464 (“[The motion to intervene’s] purpose was to obtain appellate review ... and the motion complied with, as it was required to, the time limitation for lodging an appeal prescribed by Fed.Rule App.Proc. 4(a).”). The other major concerns of prejudice and efficiency can also be addressed with proper limitation. The district court *933 can confine the issues the Unions may-raise, limiting intervention to matters that are forum-appropriate. Cf. United States v. Tennessee, 260 F.3d 587, 593 (6th Cir.2001) (“[S]hould CMRA hope, through intervention, to obtain higher rates and fewer obligations for community providers, this forum is not the appropriate forum to seek such relief.”); S.H. v. Stickrath, 251 F.R.D. 293, 302 (S.D.Ohio 2008) (finding that a factor weighed against intervention where state employment-relations board had exclusive jurisdiction over claim of violation of CBA rights). To the extent the assertion of the Unions’ relevant interests may cause delay, such a consideration is not grounds for denial of intervention— the analysis must be limited to the prejudice caused by the untimeliness, not the intervention itself. See Stallworth v. Monsanto Co., 558 F.2d 257, 267 (5th Cir.1977). The district court also failed to consider the potential prejudice resulting from complete denial of intervention: significant delay in resolving important issues could have resulted from collateral challenges to its orders from the Unions — as nonparties, the Unions would ordinarily not be bound by the district court’s determinations. See Martin v. Wilks, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), superseded by statute (in the civil rights context), Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074.
Given the district court’s greater familiarity with this case and interest in managing its own docket, the district court retains broad discretion in setting the precise scope of intervention. Further argument from the Unions is warranted to make a clearer case as to the exact purposes for which intervention is sought. Nevertheless, the facts on appeal do point to some matters on which, at a bare minimum, the Unions must be permitted to intervene, and others on which intervention is inappropriate. See Trbovich, 404 U.S. at 539, 92 S.Ct. 630 (reversing and remanding with an order for limited intervention in accordance with the opinion). The core of the Unions’ purpose for intervention must be participation in shaping future remedial efforts and the right to appeal or challenge adverse orders issued within the 30-day period before intervention was sought — specifically the November 4 Order. See Linton ex rel. Arnold v. Comm’r of Health & Env’t, State of Tenn., 973 F.2d 1311, 1318 (6th Cir.1992) (“Since the post-judgment motions to intervene were filed 25 days after the district court entered its final judgment, their applications were made within the 30-day time period prescribed for purposes of filing a notice of appeal.”). The district court, however, should be vigilant about attempts to transform this environmental enforcement action into a labor arbitration. The Unions’ Contract Clause and Takings arguments are targeted at the City — the district court’s order is not subject to the constraints of these clauses — and should be raised in separate suits to the extent justified by actual City actions. Intervention should be limited to preclude attempts to re-litigate settled facts, reports, and orders. To the extent the Unions contest the substance of labor issues facing the DWSD, those matters are appropriate for contract negotiations with the City, but the district court should not reopen the evidentiary record and may reasonably rely on past findings to draw its conclusions.
Ill
For the foregoing reasons, the judgment of the district court denying intervention is REVERSED and REMANDED for a limited grant of intervention. Arguments about the procedural and jurisdictional invalidity of the November 4 Order within the scope of intervention, including that *934 there was no hearing in issuing an injunction under Rule 65 and that the court exceeded its powers under the All Writs Act, should be argued below on remand. This judgment applies to appeal No. 11-2569 only; AFSCME Council 25’s motion to voluntarily dismiss is GRANTED and appeal No. 11-2517 is dismissed.

. The Unions admit that their representatives met with the Root Cause Committee, but contend that they were not told about the details of the Committee's planned recommendations and therefore were unable give effective input.

. Appellant AFSCME Council 25 has moved to voluntarily dismiss its appeal, No. 11-2517, with the consent of Defendants-Appellees. Fed. R.App. P. 42(b). We now grant that motion.

. Appellant Local 207 has also moved for permissive intervention under 24(b) in the alternative. Since the issue in this case is timeliness, the analysis is effectively the same for both. Mich. Ass’n for Retarded Citizens, 657 F.2d at 105.